# STATE OF CONNECTICUT *v.* ENRIQUE F.*
## (AC 34153)

Sheldon, Keller and Harper, Js.

Argued September 11—officially released December 3, 2013

---

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

*Robert E. Byron,* assigned counsel, for the appellant (defendant).

*Lisa A. Riggione,* senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III,* state's attorney, and *Sharmese L. Hodge,* assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Enrique F., appeals from the judgment of conviction, rendered after a jury trial, on two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and (2). On appeal, the defendant claims that the trial court erred in granting the state's motion to amend the long form information to conform to the testimony of the victim, and that he was deprived of a fair trial because of prosecutorial impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 2008, the victim, S, moved into a new house with her mother, E, and the defendant. S testified that the defendant began to engage in inappropriate conduct with her shortly after they moved into the new home in 2008. She testified that multiple times each week the defendant would touch her breasts, buttocks, and vagina, both over and under her clothing. The defendant instructed S not to report this conduct because it would break up the family.

S specifically testified that the defendant "touched" her from the summer of 2009 throughout her seventh grade school year, and during the summer of 2010. She

stated that any abuse would take place while E was at church, which was several times per week. On Sundays, E would leave early in the morning to go to church, and on Wednesdays she would be there until nine at night. At these times, the defendant was the only adult at home with S.

S also described the defendant's general behavior in the house. S testified that the defendant would walk into her room unannounced when she was getting dressed after a shower. The defendant "would just come in the room, without knocking, and open the door and just stare at me . . . then, after, like, a few moments, he would leave." The defendant would also randomly "slap" S on her buttocks. The defendant characterized the slapping as "a game" the family played, but S testified that the slapping made her uncomfortable and that she told the defendant to stop.[1] O, S's grandmother, witnessed the defendant slapping S's buttocks and entering her room unannounced. Although this behavior was common in the household generally, S testified that it specifically occurred during January through May, 2010, while she was in the seventh grade. S began to complain that she wanted to live with O.

Upon O's request, the family's pastor met with O, E, the defendant, and S on August 10, 2010, to discuss why S wanted to move out of her house. At the meeting, S alleged that the defendant was sexually assaulting her. O immediately contacted the police, despite the fact that the defendant denied the allegations and pleaded with the family not to call the authorities. The

---

[1] S's cousin, sixteen years old at the time of trial, testified that the defendant had slapped her on the buttocks on multiple occasions as well. The cousin also stated that this made her feel uncomfortable and that the defendant claimed he was "just playing around." The cousin also testified that the defendant had entered S's room, without knocking, while she and S were dressing after having taken showers.

police responded, learned that S had accused the defendant of sexual assault, and the Department of Children and Families (department) directed the responding officers to send S home with O. The defendant was arrested on August 11, 2010, and S remained in the custody of O.

The defendant was tried on one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), and two counts of risk of injury to a child in violation of § 53-21 (a) (1) and (2). The jury found the defendant guilty on both counts of risk of injury to a child but acquitted him of sexual assault. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erred in allowing the state to amend the long form information and expand the time of the alleged offenses by six months in order to conform to S's testimony. We disagree.

The following additional facts are necessary to resolve this claim. When the trial commenced, the operative long form information charged that "in or around January–June 2010," the defendant committed the offenses of risk of injury to a child in violation of § 53-21 (a) (1) and (2). On October 13, 2011, three days into trial, the state moved to amend the long form information to read that the conduct occurred "in or around August 2009–August 2010," so that the information would conform to S's testimony that the conduct in question occurred while she was in the seventh grade. On appeal, the defendant claims: (1) the state did not have good cause for the amendment because "bare assertions" that a change is needed to conform the information to the evidence are insufficient; and (2) the defendant's substantive right to notice was prejudiced because, according to the defendant, he had "*no* notice of any charges that might be claimed against him for

the period August, 2009, to December, 2009." (Emphasis in original.)

Our standard of review and the requirements for amending the information are well established. "On appeal, our [standard of review] of the court's decision to permit an amendment to the information is one of abuse of discretion. . . . Before a trial begins, the state has broad authority to amend an information . . . . Once the trial has started, however, the prosecutor is constrained by the provisions of Practice Book § 36-18. . . . If the state seeks to amend charges after the commencement of trial, it shoulders the burden of establishing that no substantive rights of the defendant would be prejudiced. . . . Like any other party petitioning the court, the state must demonstrate the basis for its request. Under [Practice Book § 36-18], the state must show: (1) good cause for the amendment; (2) that no additional or different offense is charged; and (3) that no substantive right of the defendant will be prejudiced." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullien*, 140 Conn. App. 299, 311, 58 A.3d 383 (2013). The defendant does not allege that the amended information charged an additional or different offense, and therefore the only issues are whether the state had good cause to amend the information and whether he suffered prejudice.

A

To show good cause to amend, the state must articulate a reason why the amendment is required, beyond a "bare assertion that it is merely conforming the charge to the evidence." *State* v. *Jordan*, 132 Conn. App. 817, 825, 33 A.3d 307, cert. denied, 304 Conn. 909, 39 A.3d 1119 (2012). The testimony of minor victims, however, requires special consideration, and we have allowed the state to amend the time frame in the information in light of a minor victim's testimony at trial. *State* v.

*Mullien,* supra, 140 Conn. App. 312–13; *State* v. *Grant,* 83 Conn. App. 90, 100–101, 848 A.2d 549, cert. denied, 270 Conn. 913, 853 A.2d 529 (2004); *State* v. *Wilson F.,* 77 Conn. App. 405, 413, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003). In these cases, "the age of the [victim] at the time of the incidents, his age at the time of trial and his testimony concerning the dates at trial" amounted to good cause to amend the time frame in the information to conform to the testimony. *State* v. *Wilson F.,* supra, 413.

Here, the state argued at trial that S's testimony "came in differently" than anticipated because the state had expected that S would be able to "narrow [the alleged conduct] down to a six month window and [was] unable to . . . ." We conclude that the state's unexpected difficulty in establishing a narrower time frame through the testimony of the minor victim constituted good cause to amend the information. See *State* v. *Mullien,* supra, 140 Conn. App. 312–13.

B

The defendant also argues that his substantive rights were prejudiced by the amendment of the information because he was deprived of "true notice" of "a six month window of liability three days into trial."[2] "[An] improper amendment of the information implicates the defendant's constitutional right to fair notice of the charges against him." *State* v. *Jordan,* supra, 132 Conn. App. 826. At trial, the state has the burden of proving that amending the information does not prejudice the defendant's substantive rights. Id. On appeal, however, the defendant bears the burden of making a "specific showing of prejudice in order to establish that he was

_____

[2] We note that the trial court invited the defendant to request time to investigate in light of the amended information. The defendant stated that he would let the court know if he needed a continuance but never filed a motion for one.

denied the right of due process of law." (Internal quotation marks omitted.) Id.; see also *State* v. *Wilson F.*, supra, 77 Conn. App. 413 n.6. In the prejudice analysis, "the decisive question is whether the defendant was informed of the charges with sufficient precision to be able to prepare an adequate defense." (Internal quotation marks omitted.) *State* v. *Mullien*, supra, 140 Conn. App. 313; see also *State* v. *Tanzella*, 226 Conn. 601, 608, 628 A.2d 973 (1993). If the defendant has not asserted an alibi defense and time is not an element of the crime, then there is no prejudice when the state amends the information "to amplify or to correct the time of the commission of the offense . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, supra, 83 Conn. App. 101. Ultimately, if the amendment has no effect on the defendant's asserted defense, there is no prejudice. *State* v. *Tanzella*, supra, 616 (amendment's effect "logically distinct" from defense asserted); *State* v. *Jordan*, supra, 826–27.

We conclude that the defendant sustained no prejudice because his admissions at trial made any amendment to the time frame irrelevant, and the defenses that were raised were "logically distinct" from the amendment to the information.[3] For the two counts of risk of injury to a child, the state had the burden of proving: (1) the defendant placed S in a situation or did any act where her health, life, or morals were likely to be injured (situational count); and (2) the defendant had contact with S's intimate parts or subjected S to contact with his intimate parts (intimate contact count). General Statutes § 53-21 (a) (1) and (2). The amendment to the information had no effect on defending against either of these charges.

---

[3] The defendant was acquitted of sexual assault in the second degree and, therefore, his rights were not prejudiced with respect to the circumstances surrounding this charge. See *State* v. *Luster*, 279 Conn. 414, 437, 902 A.2d 636 (2006) (prosecutorial misconduct). Our analysis is limited to the convictions for risk of injury to a child.

The following facts are necessary to resolve this claim. At trial, the defendant admitted the following allegations in relation to the situational count: (1) he repeatedly "slapped" S's buttocks; (2) he entered S's room unannounced while she was in a state of undress; and (3) he disciplined her with a belt. The defendant argued that this behavior did not amount to risk of injury to a child, without asserting more. With respect to the intimate contact count, the state alleged that the defendant touched S's breasts, buttocks, and vagina, over and under her clothes. In his defense, the defendant highlighted inconsistencies in S's story and weaknesses in the state's case. He argued ultimately that S had fabricated the allegations in an effort to be removed from the home and placed with O.

Expanding the time frame in the information by six months did not have any effect on the defendant's conviction of risk of injury to a child, based on the defendant's admissions and the defenses asserted. The defendant admitted many of the allegations that the jury reasonably could have used as the bases for a finding of guilt on the situational count. Furthermore, S testified that all of the conduct the defendant admitted to, except the discipline with the belt, was behavior that occurred constantly, including during her seventh grade school year and summer, which the time frame in the original long form information encompassed. In light of the defendant's admissions, expanding the time frame in the information could not have resulted in any prejudice. The defendant's defense to the intimate contact count was centered on attacking S's credibility. This defense is "logically distinct" from the amendment because a change in the time frame of the allegations does not impair a defendant's ability to call into question S's credibility. See *State* v. *Victor C.*, 145 Conn. App. 54, 67, 75 A.3d 48 (2013).

In light of the defendant's admissions and defenses, notice of the additional six month period had no bearing on his ability to prepare an adequate defense. Accordingly, we conclude that there was no prejudice and that the trial court did not err in granting permission to amend the information.

II

The defendant also argues that prosecutorial impropriety throughout the trial deprived him of his right to due process.[4] We find no such impropriety.

The defendant argues that the state intentionally inserted repeated references to suicide into the trial with the purpose of inflaming the passions of the jury. The following additional facts are necessary to resolve this claim. The first reference to suicide came from S herself, without objection. During her direct examination, S stated that she went to the hospital because "I wanted to kill myself . . . [b]ecause I was hurt too much . . . I was destroyed [by] what he did to me that, like, no guy would want a girl like that. So, I ended up in the hospital." The second reference came from an employee of the department, who stated that she visited S's residence to perform "crisis intervention," which occurs when a child is "making suicidal ideations . . . ." The defendant objected, and the response was stricken from the record.

The third reference to suicide occurred during the direct examination of Christiane Kubit, a psychiatrist who examined S. The defendant requested an offer of

[4] The defendant's brief presents two separate issues on appeal: (1) the court improperly denied his motion for a mistrial after the prosecutor deliberately violated a "court order," and (2) prosecutorial impropriety. We interpret the defendant's brief as only raising one claim, prosecutorial impropriety. An appeal from the denial of a motion for a mistrial that is based on a prosecutor's alleged violation of an evidentiary court order is reviewed as a claim of prosecutorial impropriety. *State* v. *Tok*, 107 Conn. App. 241, 261, 945 A.2d 558, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008).

proof because the state intended to introduce through Dr. Kubit information regarding suicidal ideations. The court concluded that "the idea of the suicidal ideations . . . is separate from the psychological aspects [of the effects from sexual assaults]. . . . [T]he doctor can testify to the fact that [S was] admitted for psychiatric treatment . . . [b]ut, I don't think that . . . saying there's suicidal ideations becomes all that relevant . . . ." Shortly after the court's ruling, the jury entered the courtroom and the following colloquy took place:

"[The Prosecutor]: And, do you recall treating a child by the name of [S]?

"[Dr. Kubit]: Yes.

"[The Prosecutor]: Can you tell me about that?

"[Dr. Kubit]: She was admitted to the inpatient unit . . . .

"[The Prosecutor]: And what was she admitted for?

"[Dr. Kubit]: She was admitted for suicidal ideation."

The defendant objected, the state quickly offered to strike the response, and the response was stricken with a curative instruction given to the jury to ignore the witness' answer. Thereafter, the defendant's motion for a mistrial was denied.

The final reference to suicide came during the state's closing argument, when the prosecutor argued, "[S] sat on the [witness] stand and said to you . . . she contemplated taking her own life because she thought she was damaged goods." The court sustained the defendant's objection to this comment, and the defendant again moved for a mistrial. The court denied the motion, noting that the defendant also referenced S's "psychological problems" in his closing. The court determined that "this is a jury that understands that there was, certainly, some type of psychiatric crisis,

but the issue of whether it was suicidal or not was what was kept out of the jury's consideration."[5] The defendant argues that, collectively, these instances evidenced the prosecutor's intentional disregard for the court's instructions throughout the trial in an attempt to inflame the passions of the jury, thereby amounting to prosecutorial impropriety and warranting a new trial. We do not agree.

"In analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 610–11, 65 A.3d 503 (2013).

The defendant asserts that the prosecutor deliberately disregarded the court's instructions regarding evidence of S's suicidal ideation. A prosecutor must follow court rulings during trial, including evidentiary rulings. *State* v. *Reynolds*, 118 Conn. App. 278, 292, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010). Even if the prosecutor believes the court's ruling is legally incorrect, he or she may not make arguments or encourage conduct in derogation of that ruling. Id. "A demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the

---

[5] We feel obligated to comment that this court believes that S's thoughts about suicide, especially in light of the expert testimony discussing the psychological effects of prior sexual abuse, were relevant to the charges. Also, we cannot reconcile how S's "psychological problems" are relevant, yet the fact that she thought about suicide is not.

attempted introduction of obviously inadmissible evidence may entitle the defendant to a new trial." (Internal quotation marks omitted.) Id. When inadmissible evidence is introduced inadvertently and the prosecutor recognizes the error and then takes steps to correct it, the prosecutor's conduct militates against any finding that he or she deliberately violated a court order. See *State* v. *Lopez*, 280 Conn. 779, 801, 911 A.2d 1099 (2007).

The record lacks any evidence demonstrating that the prosecutor here deliberately violated any court ruling regarding the admissibility of references to suicidal ideation. The first instance the defendant takes issue with occurred when the prosecutor asked a department worker, "What is crisis intervention?" and the worker explained that crisis intervention occurs when a child is "making suicidal ideations . . . ." After the court sustained the defendant's objection the prosecutor did not revisit the question. The defendant has not directed this court's attention to, nor can we find in the record, any order that would have precluded the prosecutor from asking this question. Without a relevant court order to purportedly violate, we find no impropriety here.[6]

---

[6] At oral argument before this court, the defendant claimed that there was a specific court order reflecting that evidence of suicide "had clearly been forbidden by the court," after S testified that she thought about killing herself. The defendant mischaracterizes the trial court's rulings. Contrary to the defendant's arguments, the court was merely summarizing a series of individual rulings when it stated, after closing arguments, "I have consistently ruled that [evidence of suicide] is not admissible." This statement does not reflect the existence of a standing order. The defendant also directs our attention to trial counsel's statement to the court, "The subject of suicide came up . . . [and] I thought after a sidebar, it was clear that it was not going to come up." The trial court never issued a blanket order precluding any and all references to suicide. On the contrary, whenever the issue of suicide arose the court considered the admissibility of the evidence on a case-by-case basis, usually through an offer of proof. Furthermore, any argument that a standing order existed is undermined by the fact that the defendant allowed S to testify regarding her thoughts about suicide without objecting or moving to strike the testimony.

The circumstances surrounding the second alleged instance of impropriety, regarding Dr. Kubit's testimony after the offer of proof, indicate that the prosecutor did not act deliberately in contravention of the court's ruling. It was obviously a mistake for Dr. Kubit to use the phrase "suicidal ideation" shortly after the court ruled that she could make reference only to S's "psychiatric treatment." The prosecutor, following the defendant's objection, immediately acknowledged the error and rephrased the question in accordance with the court's ruling. There is nothing in the record to indicate that the prosecutor's reaction was less than genuine. The prosecutor acknowledged on the record that she was surprised by the answer because Dr. Kubit was present when the court ruled that the reference to suicidal ideation was inadmissible. On the basis of the record, there is nothing to indicate that the prosecutor intentionally violated the court's ruling.

Finally, there was no impropriety when the prosecutor recounted S's testimony during closing arguments, stating that S "contemplated taking her own life because she thought she was damaged goods." Our Supreme Court has advised: "[A] prosecutor may argue the state's case forcefully, [provided the argument is] fair and based on the facts in evidence and the reasonable inferences to be drawn therefrom. . . . [T]he prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record." (Citation omitted; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 766, 51 A.3d 988 (2012). This is to ensure the prosecutor does "not appeal to the emotions, passions and prejudices of the jurors . . . [which has] the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Kendall*,

123 Conn. App. 625, 632–33, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

Here, in accordance with our jurisprudence, the prosecutor was merely recounting testimony that properly was in evidence. The prosecutor did not violate any court order or improperly appeal to the jury's prejudices or passions during her closing argument, which was rightly based on the facts in evidence.[7] The defendant's claim fails because we find no improper conduct.[8]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] The defendant's brief cites to numerous studies in an attempt to show that the term "suicide" is inherently inflammatory and, moreover, that curative instructions are largely ineffective. We will not take these studies into account, as they were not part of the record before the trial court. *Ariaga* v. *Commissioner of Correction*, 120 Conn. App. 258, 261, 990 A.2d 910 (2010).

[8] In his reply brief, the defendant argues that this court should look to *State* v. *Santiago*, 143 Conn. App. 26, 66 A.3d 520 (2013), and invoke our supervisory powers, sua sponte, to reverse his conviction. We decline to entertain this argument because it was raised for the first time in the defendant's reply brief. *Perry* v. *State*, 94 Conn. App. 733, 740 n.5, 894 A.2d 367, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006).

We note, however, that the facts in *Santiago* are strikingly different from the facts of this case. The prosecutor at issue in *Santiago* engaged in a "deliberate pattern of making [improper] comments in numerous other cases." *State* v. *Santiago*, supra, 143 Conn. App. 28. We cited six other cases where our appellate courts had concluded that the prosecutor in *Santiago* had made improper remarks. Id., 45–46. Here, we have no evidence of conduct even remotely similar to that in *Santiago*. Defense counsel attempts to remedy this discrepancy by arguing that we should extend *Santiago* in a way that would result in a presumption of impropriety against all prosecutors in an office where any prosecutor has been accused of anything

improper. There is no basis for this argument in *Santiago*, which involved the conduct of a lone prosecutor.